**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0474n.06

No. 07-2554

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

NATIONAL LABOR RELATIONS )
BOARD, )
)
**Petitioner,** )
)     PETITION TO ENFORCE
)     ORDER OF THE NATIONAL
v.     )     LABOR RELATIONS BOARD
)
BEACON ELECTRIC COMPANY, )
)          **O P I N I O N**
**Respondent.** )
_____ )

**FILED**

*May 04, 2012*

LEONARD GREEN, Clerk

Before:  **KETHLEDGE and WHITE, Circuit Judges; POLSTER,*** **District Judge.**

   **HELENE N. WHITE, Circuit Judge**.  The National Labor Relations Board ("the Board")

petitions for summary enforcement of its July 12, 2007 order finding that Beacon Electric Company

("Beacon") violated § 8(a)(1) and (3) of the National Labor Relations Act ("the Act"), 29 U.S.C.

§ 158(a)(1), (3), by refusing to hire or consider for hire 49 Union members, *Beacon Electric Co.*,

350 N.L.R.B. 238 (2007).  The challenged order required Beacon to offer each applicant employment

and back pay.  Beacon argues that we must deny enforcement because the alleged violations were

never established due to the Board's failure to require that the General Counsel prove the applicants

had the subjective intent to seek employment with Beacon.  This element of the Board's case was

---

   *The Honorable Dan Aaron Polster, United States District Judge for the Northern District of
Ohio, sitting by designation.

1

recognized in *Toering Electric Co.*, 351 N.L.R.B. 225 (2007), decided after the Board's decision in the instant case, and before its denial of Beacon's motion for reconsideration. We **GRANT** the General Counsel's petition for enforcement and remand for further proceedings consistent with this opinion.

**I.** Facts and Procedural History

This case involves the International Brotherhood of Electrical Workers, Local Union No. 212, AFL-CIO ("Union") "salting"[2] campaign at Beacon, an electrical contractor in southwest Ohio with an office in Cincinnati. Between January and May 1997, Union organizers and members attempted to apply for work at Beacon. Although Beacon hired electricians during this time period, it did not permit any of the 49 Union applicants to apply.

On July 18, 1997, the Union filed an unfair labor practice charge with the Board, and on January 28, 1998, the General Counsel for the Board filed a complaint alleging that Beacon violated § 8(a)(1) and (3) of the Act (29 U.S.C. § 158(a)(1), (3)). Beacon denied having anti-union animus and asserted that it hires electricians exclusively by referral, turns away anyone without a referral, and did not permit the Union applicants to complete applications because they lacked referrals. Beacon claims to have adopted its referral policy in 1994, but it never put this policy in writing or

_____

[2]"Salting a job" has been defined as "the act of a trade union in sending a union member or members to an unorganized jobsite to obtain employment and then organize the employees." *Tualatin Electric, Inc.*, 312 N.L.R.B. 129, 130 n.3 (1993). A "salting campaign" can involve both bona fide applications and "unions submit[ting] batched applications on behalf of individuals who were neither aware of the applications nor interested in employment opportunities with the employer," or individuals submitting applications in order to create a basis for unfair labor practice charges. *See Toering Electric Co.*, 351 N.L.R.B. 225, 225 (2007). The Board's July 12, 2007 decision and order in this case referred to the Union members' attempted applications to Beacon as a "salting campaign," 350 N.L.R.B. 238, 239 (2007), and neither party challenges this characterization.

made it known to the public. The "Applications for Employment Policy" posted in Beacon's lobby[3] made no reference to the alleged referral policy. *See Beacon Electric Co.*, 350 N.L.R.B. at 239-41. When the Union members tried to apply at Beacon, they were directed to the posted policy and informed that Beacon was not hiring. Nevertheless, Beacon hired electricians within days of the Union members' unsuccessful application attempts.[4]

In addition to relying on its purported referral policy, Beacon claimed that the applicants, or "salts," were not sincerely interested in employment with Beacon, and thus were not entitled to the protection of the Act.[5] During the pre-trial phase of the litigation before the Administrative Law

---

[3]The posted policy stated:

BEACON ELECTRIC COMPANY
APPLICATIONS FOR EMPLOYMENT POLICY

Beacon makes every effort to select the most qualified employees for employment. To accomplish this, it develops a pool of applicants who are evaluated and ranked so that the most qualified are selected from the pool. Accordingly, Beacon accepts applications and resumes only at specific times of the year, whether or not it is currently hiring. The periods during which applications and resumes are accepted are determined by the President of Beacon.

When applications are being accepted, they must be completed in person at the main office of the company. When the company is hiring, the applicants selected from the pooled applications will be interviewed and be required to pass certain skills, aptitude and substance abuse tests.

[4]The Board's decision and order provides extensive facts regarding the Union members' attempts to apply at Beacon. *Beacon Electric Co.*, 350 N.L.R.B. at 239-41.

[5]Beacon relied on two cases, *W.D.D.W. Commercial Systems & Investments, Inc.*, 21-CA-29201, 1997 WL 33316112 (N.L.R.B. 1997), and *A. Montano Electric*, 21-CA-31126, 1997 WL 33316113 (N.L.R.B. 1997). In *W.D.D.W.*, the ALJ condemned IBEW Local 441's salting campaign against CLP, a non-union labor supplier, and concluded that some of the union "salts" did not intend to accept employment if offered, but rather, simply intended to force the employer to incur substantial expenses in defending against ULP charges. Thus, the ALJ found that although the employer's hiring rules would otherwise constitute an unfair labor practice, a "disabling conflict" between the salts' interests and the employer's excepted the salts from the definition of "employee" under the Act. In *Montano Electric*, another ALJ took judicial notice of the *W.D.D.W. Commercial* decision in a case involving the same union local. Subsequent to the trial in the instant case, the

3

Judge ("ALJ"), the parties sought discovery. Beacon sought all documentation showing that the individual alleged discriminatees applied or attempted to apply for a position at Beacon; tax returns, W-2 forms and other documentation regarding the alleged discriminatees' employment, wages, unemployment benefits, and workers compensation benefits, including any payments from the Union, beginning January, 1997; and any agreements between the discriminatees and the Union with regard to salting activities. Beacon asserted that while not conclusive, the information was relevant to whether the discriminatees were bona fide job applicants. The ALJ allowed the discovery of information regarding the efforts to apply at Beacon, suggested that there was probably a standard payment to salters made by the Union, which amount could be the subject of a stipulation, and ruled that the other information was relevant to the compliance stage of the proceedings, and would not be useful in helping the ALJ decide the matters before him at the time.

At the evidentiary hearing, the primary focus was on the referral policy. However, the ALJ permitted some questions regarding whether the alleged discriminatees truly sought employment at Beacon and disallowed others. After concluding the evidentiary hearing, the ALJ issued a decision on July 14, 1998, sustaining the General Counsel's allegations. The ALJ found that Beacon's refusal to hire the salts was not based on a bona fide referral system, but on anti-union animus.[6] The ALJ

NLRB affirmed the finding in *W.D.D.W. Commercial* that the employer's hiring practice violated the NLRA, but rejected the ALJ's conclusion that the paid salts were not employees under the Act, instead holding that the employer had the burden of proving that it denied employment because of IBEW Local 441's practices. *W.D.D.W. Commercial Sys. & Invs., Inc.*, 335 N.L.R.B. 260 (2001).

[6]The ALJ found, inter alia:

Although [Beacon] seeks to disavow its posted policy and claim that it relied on its undisclosed referral policy, the fact that it kept this so-called policy secret from potential applicants and did not even reduce its policy to writing clearly does not contribute to [Beacon]'s burden to persuasively show that it would have ignored or

4

further rejected Beacon's argument, based on the Union's tactics, that the discriminatees/salts were not bona fide applicants for employment. The ALJ found that although it may be unwise for full-time Union business agents to join in the application process when other bona fide applicants who are regularly employed in the trade are also applicants, the Union agents still may be statutory employees under the NLRA, and that the Union's tactics were not so extreme so as to strip the Union of its right to engage in the organizational activity. The ALJ concluded that "consistent with Board precedent and the Supreme Court's decision in *NLRB v. Town & Country Electric*, [516 U.S. 85] (1995), all the involved applicant discriminatees are bona fide applicants." *See* 350 N.L.R.B. at 254.

Beacon filed extensive exceptions to the ALJ's decision, including several related to the bona fide "employee" status of the salts. On June 9, 2000, the Board remanded the case to the ALJ for further consideration in light of the Board's May 11, 2000 decision in *FES (a Division of Thermo Power)*, 331 N.L.R.B. 9 (supplemented 333 N.L.R.B. 66 (2001)), *enforced* 301 F.3d 83 (3d Cir. 2002), in which the Board set forth a new legal framework for analyzing allegations of refusal-to-hire and refusal-to-consider violations involving union applicants.[7] On remand, Beacon sought to reopen

> failed to allow job seekers to file applications even in the absence of their probable status as union affiliated electricians.
> . . . .
> [Beacon] used an unpublicized referral procedure that was different than the posted policy it pointed out to the union applicants. This procedure was exclusive in nature and basically insured that it would receive applications only by referrals from known sources that would refer only nonunion applicants.

*Beacon Electric Co.*, 350 N.L.R.B. at 251.

[7]The Board's order stated:

The Board has decided to remand this case to the judge for further consideration in light of *FES*, including but not limited to: (1) whether the General Counsel established that the Respondent unlawfully refused to hire the alleged discriminatees

the record to submit additional evidence regarding the *FES* elements. On December 20, 2000, the ALJ issued a supplemental decision denying Beacon's request to reopen the record and reaffirming his earlier findings and conclusions. *Beacon Electric Co.*, 350 N.L.R.B. at 253-56.

Beacon again filed extensive exceptions to the ALJ's decision, arguing that the ALJ erred in refusing to reopen the record and that the General Counsel failed to establish the elements of a prima facie case under *FES,* and incorporating by reference its earlier-filed exceptions regarding "the ALJ's finding that each alleged discriminatee . . . [w]as an actual, bona fide applicant entitled to the protection of the Act." On July 28, 2003, the Board remanded the case again, finding that the ALJ erred in refusing to reopen the record to allow Beacon to present a defense that it would not have considered or hired the Union applicants even absent discrimination. The Board explained, although "we agree with the judge that the General Counsel met his initial burden under *FES* of establishing an unlawful refusal to consider or to hire the union applicants, we find that [Beacon] was improperly denied an opportunity to present evidence to show that it would not have considered or hired the alleged discriminatees . . . ." The Board remanded the case "for further consideration of whether, under *FES*, [Beacon] can demonstrate that it would not have considered or hired the alleged discriminatees, even in the absence of their union activity or affiliation." The remand permitted "reopening the record to obtain evidence necessary to decide the case under the *FES* framework." The Chairman would have additionally permitted [Beacon] to present evidence in support of its claim that the alleged discriminatees were not bona fide applicants for employment.

for openings filled by other applicants, and (2) the entry of an appropriate recommended remedy and order. The judge may, if necessary, reopen the record to obtain evidence required to decide the case under the *FES* framework.

6

On remand for the second time, Beacon waived its right to present additional evidence, stating that it "reviewed the record . . . and has decided that given the broad nature of the Board's order with respect to the General Counsel's prima facie case and the limited nature and scope of the remand order, and given the significant cost and time associated with reopening the record, [it] waives any right to hearing it may have had." Beacon had argued in its exceptions that the Board should reverse the ALJ's finding that the General Counsel had established a prima facie case. Having lost that issue on appeal, it chose to rest on the record and argue that because of its neutral referral-hiring system, it would not have hired the applicants even in the absence of anti-union animus.

The presiding ALJ had retired by the time of the second remand and a different ALJ was substituted. The new ALJ issued a second supplemental decision on May 5, 2004, concluding that because Beacon decided not to reopen the record, it did not meet its burden of proof in the remand proceeding before him. *Beacon*, 350 N.L.R.B. at 256-57. Beacon filed exceptions to the ALJ's supplemental decision, which incorporated its two earlier-filed exceptions, and argued that it had established that pursuant to its neutral referral policy it would not have hired the applicants even in the absence of their Union affiliation.

On July 12, 2007, applying the framework set forth in *FES*, the Board agreed with the ALJ's finding that Beacon's referral-policy defense was pretextual,[8] and found that Beacon violated

_____

[8]The Board declined to adopt the ALJ's finding that the referral policy itself "constitutes a discriminatory practice inherently destructive of important employee rights."

§8(a)(1) and (3) of the Act.[9] It ordered Beacon to offer employment and back pay to the 49 Union members who unsuccessfully applied in 1997.

Three months later, on October 11, Beacon filed a motion for reconsideration of the Board's decision, requesting that it reconsider its findings, reopen the record, and remand the case to the ALJ for further proceedings consistent with the Board's September 29, 2007 decision in *Toering*, 351 N.L.R.B. 225, in which the Board modified the *FES* framework and held that in refusal-to-hire cases, the General Counsel must establish that the applicants had genuine interest in seeking employment. Beacon argued that *Toering* "rests on a point of law that Beacon Electric has argued throughout its case," that the *Toering* case was nearly identical to the instant case, and that under *Toering*, the Board's decision in this case cannot stand. The Board denied Beacon's motion for rehearing,[10] and filed the instant petition to enforce its order.

---

[9]The Board stated:

Believing that the Respondent needed to hire electricians in order to meet a contractual commitment, union organizers and members made numerous attempts to apply in person for employment with the Respondent between January 21 and May 5. The Respondent was hiring during this period. In fact, the Respondent hired 71 electricians between January 21 and August 22. Despite the respondent's ongoing need for labor, however, the 49 alleged discriminatees were not allowed to apply.

As detailed below, during the salting campaign the Respondent did not tell the alleged discriminatees that they could not apply because they did not have referrals. Instead, the Respondent deceived them by denying that it was hiring and deliberately sought to divert them from discovering its referral policy by leading them to believe that – when it started hiring – they would be permitted to apply, without referrals. In accordance with the posted Applications for Employment Policy.

[10]The Board found that "the Respondent's motion has not raised any 'extraordinary circumstances' warranting reconsideration of the Board's decision. See Section 102.48(d)(1) of the Board's Rules and Regulations." The Chairman also would have denied the motion as untimely. The Board determined that its decision in *Toering* did not constitute an extraordinary circumstance under its rules, and that the case was properly decided under *FES*, "the then-current law."

**II.** Relevant Law

Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

In *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983), the Supreme Court resolved a circuit split on whether the Board's shifting burden of proof framework for mixed-motive cases, as announced in *Wright Line, a Division of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899, 904 (1st Cir.1981), *cert. denied*, 455 U.S. 989 (1982), was proper. *Id.* at 397, 402-03. The *Wright Line* framework placed the burden of proof on the General Counsel to show an adverse employment action based in whole or in part on anti-union animus. The Board then permitted the employer to avoid being adjudicated a violator by showing that it would have taken the same adverse action without regard to its anti-union animus. The Board regarded this as an affirmative defense and placed the burden of persuasion on this issue on the employer. The Supreme Court in *Transportation Management* not only rejected the argument that this framework violated the NLRA and APA by impermissibly placing on the employer the burden of showing that it would have taken the adverse action anyway, but also expressly found that the Board's various constructions of the Act and allocations of burdens were permissible constructions of the Act entitled to deference:

> As we understand the Board's decisions, they have consistently held that the unfair labor practice consists of a discharge or other adverse action that is based in whole or in part on anti-union animus – or as the Board now puts it, that the employee's protected conduct was a substantial or motivating factor in the adverse action. The General Counsel has the burden of proving these elements under § 10(c). But the Board's construction of the statute permits an employer to avoid being adjudicated a violator by showing what his actions would have been regardless of his

9

forbidden motivation. It extends to the employer what the Board considers to be an affirmative defense but does not change or add to the elements of the unfair labor practice that the General Counsel has the burden of proving under § 10(c). We assume that the Board could reasonably have construed the Act in the manner insisted on by the Court of Appeals. [Assigning the burden of production, but not the burden of persuasion, to the employer.] We also assume that the Board might have considered a showing by the employer that the adverse action would have occurred in any event as not obviating a violation adjudication but as going only to the permissible remedy, in which event the burden of proof could surely have been put on the employer. The Board has instead chosen to recognize, as it insists it has done for many years, what it designates as an affirmative defense that the employer has the burden of sustaining. We are unprepared to hold that this is an impermissible construction of the Act. "[T]he Board's construction here, while it may not be required by the Act, is at least permissible under it . . .", and in these circumstances its position is entitled to deference. *NLRB v. Weingarten, Inc.*, 420 U.S. 251, 266-267 [] (1975); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236 [] (1963).

*Transp. Mgmt.*, 462 U.S. at 401.

In *NLRB v. Town & Country Electric, Inc.*, 516 U.S. 85, 88-89 (1995), the Supreme Court resolved another circuit split, upholding as reasonable the NLRB's construction of "employee" to include job applicants who are also paid union organizers. The Court rejected the argument that such union agents are not bona fide "employee" applicants because their interests are adverse to those of the employer. *Id.* at 95-96.

In *NLRB v. Fluor Daniel, Inc.* (*Fluor Daniel II*), 161 F.3d 953, 963 (6th Cir. 1998), which involved a salting campaign using volunteer, rather than paid, union organizers, this court relied on *Town & Country* and held that the volunteer organizers were "employees" under the Act. The employer also argued that the Boilermakers' Union's "Fight Back" campaign was "an abuse of NLRB processes, using the Act as a sword when it is intended only as a shield." *Id.* at 963. This court found such an argument foreclosed by *Town & Country*.[11]

---

[11]This court stated:

*Fluor Daniel II* did, however, reject the NLRB's practice of deferring proof of job availability to the compliance stage of the proceeding. This court explained that compliance proceedings are appropriate only after a violation of the Act has been established. A violation of the Act is not established where the failure to hire is due to a lack of openings or the absence of qualified applicants, rather than anti-union animus. The Court concluded that the General Counsel is required to match applicants with available jobs as part of establishing that there has been a refusal-to-hire violation of the Act.

This court's decision in *Fluor Daniel II*, together with other circuits' decisions in similar cases, led to the Board's 2003 decision in *FES*, 331 N.L.R.B. 9. Prior to *FES,* the General Counsel's case under *Transportation Management*, 462 U.S. at 402-03, consisted of two elements – anti-union animus and the occurrence of a covered action, such as a discharge or failure to hire. 161 F.3d at 966. In *FES*, the Board established a new framework for litigating § 8 (a)(3) cases:

> To establish a discriminatory refusal to hire, the General Counsel must . . . first show the following at the hearing on the merits: (1) that the respondent was hiring, or had concrete plans to hire, at the time of the alleged unlawful conduct; (2) that the applicants had experience or training relevant to the announced or generally known requirements of the positions for hire, or in the alternative, that the employer has not adhered uniformly to such requirements, or that the requirements were

---

Fluor Daniel's argument that the processes of the NLRB have been coopted by the Boilermakers' Union goes hand in hand with its argument that labor unions have somehow impermissibly altered the definition of "employee" under the Act to include those applicants who were truly union agents . . . . Because the only concrete provision of law that Fluor Daniel points to in connection with this argument (dicta from *Sunland* cannot suffice) is the definition of "employee" in the Act, and the Supreme Court has already rejected such an argument in *Town & Country*, we cannot accept any attempt to repackage that argument in a different form. Fluor Daniel's assignment of error relating to alleged abuses of the NLRB's processes must be rejected.

*Fluor Daniel II*, 161 F.3d at 964.

themselves pretextual or were applied as a pretext for discrimination; and (3) that antiunion animus contributed to the decision not to hire the applicants. Once this is established, the burden will shift to the respondent to show that it would not have hired the applicants even in the absence of the union activity or affiliation. If the respondent asserts that the applicants were not qualified for the positions it was filling, it is the respondent's burden to show . . . that they did not possess the specific qualifications the position required or that others (who were hired) had superior qualifications, and that it would not have hired them for that reason even in the absence of their union support or activity.

*FES,* 331 N.L.R.B. at 12 (footnotes omitted).

This court evaluated the *FES* framework in the context of *Fluor Daniel II* in *Fluor Daniel, Inc. v. N.L.R.B.*, 332 F.3d 961, 969 (6th Cir. 2003), and found the framework consistent with *Fluor Daniel II* with respect to failure-to-hire violations, but inconsistent with respect to the failure-to-consider allegations.[13]

---

[13]This court explained:

*In Fluor Daniel II*, we specifically rejected the NLRB's position that a simple showing of anti-union animus and the fact that certain individuals were not hired were sufficient to show a violation of §§ 8(a)(1) and (3), holding instead that an actual "failure to hire" had to be shown. *Id*. at 967. We specifically held that in order to make out a prima facie case for a refusal-to-hire violation, the General Counsel must first establish the two elements articulated in *Transportation Management. Id.* After the General Counsel has proven both elements, the employer must present evidence that the employees in question would not have been hired, even if they had not been involved with a union. *Id.* at 966. This analysis requires the General Counsel to "match [ ] up applicants with available jobs for which they are qualified . . . ." *Id*. at 968. This means that employees involved in a violation of § 8(a)(3) must be actually qualified for the respective job positions and that the job positions must be actually available. Once the General Counsel makes a showing that the employer did not hire the qualified applicant for an available position, the General Counsel must also then show that the decision was motivated by anti-union animus. *Id.* at 966.

332 F.3d at 967-68.

Four years later (and subsequent to the Board's decision in this case), the Board held in *Toering*, 351 N.L.R.B. at 228, that the Act only covers applicants who genuinely seek employment:

> an applicant for employment entitled to protection [under the Act] is someone genuinely interested in seeking to establish an employment relationship with the employer. Simply put, only those individuals genuinely interested in becoming employees can be discriminatorily denied that opportunity on the basis of their union affiliation or activity; one cannot be denied what one does not genuinely seek. We further hold that the General Counsel bears the ultimate burden of proving an individuals' genuine interest in seeking to establish an employment relationship with the employer.

## III. Analysis

On appeal, Beacon stresses it does not challenge the Board's decision not to apply *Toering* retroactively to this case. Instead, Beacon argues that the Board's enforcement order is not enforceable because the Act only protects "bona fide applicants," and, notwithstanding Beacon's efforts to show that the Union applicants were not bona fide applicants and thus not employees under the Act, the Board refused to require the General Counsel to establish that they were; refused to itself address the issue; refused to let Beacon litigate the issue; and found a violation on a record that does not contain evidence sufficient to support a finding that the alleged discriminatees had the subjective intent to seek employment.

Following argument, we asked the parties to address an additional question:

> Does the difference between the National Labor Relations Board's decision in *Toering Elec. Co.*, 351 N.L.R.B. No. 18 (2007), and *FES, a Div. Of Thermo Power,* 331 N.L.R.B. 9, 15 (2000), concern the National Labor Relations Act, as to which we must accord deference to the Board's interpretation, or the allocation of burdens under the Administrative Procedure Act, as to which we do not?

13

Beacon's supplemental brief argues that the Board's decisions in both *Toering* and the instant case involve allocation of burdens of proof under the APA, to which this court owes no deference. Upon consideration, none of Beacon's arguments support reversal.

A

When viewing the facts unconstrained by the procedural backdrop, one might justifiably perceive an injustice: Although Beacon challenged whether the applicants had a genuine interest in employment with Beacon from the start, it has not been permitted to fully litigate that issue. One might expect that under these circumstances the Board would have granted Beacon's 2007 motion to reconsider based on *Toering*. However, Beacon does not challenge the Board's denial of its motion for reconsideration, nor does it challenge the Board's decision not to apply *Toering* retroactively to its case.

Beacon's sole argument on appeal is that the Board is not entitled to enforcement of its order because the General Counsel failed to prove a violation of the Act. The Board's answer is that the General Counsel established an unfair labor practice under the then-operative *FES* framework. Although Beacon vehemently disagrees with the Board's decision under the *FES* framework and its conclusion that the General Counsel established violations under that framework, it does not argue on appeal that the Board's order is unenforceable for that reason. Rather, it insists that General Counsel's failure to establish that the salts were genuinely interested in employment with Beacon renders the Board's decision unenforceable. Thus, our analysis begins with the understanding that the Board's decision complies with *FES*.

B

Beacon argues that a decision under the *FES* framework cannot be enforced under the Act because that framework relieved the General Counsel of the obligation to establish the applicability of the Act by showing the bona fide nature of the Union applicants' interest in employment. Beacon argues:

> In other words, the law requires the General Counsel to prove that the alleged discriminatees were protected by the Act at the unfair labor practice stage regardless of when the NLRB recognized that that was the law. As with the requirement of an actual intent to gain employment, the Board itself has conceded that acknowledging the General Counsel's burden of proof was not merely a new rule of administrative law, but instead was a necessary reading of the Act "to insure that only those for whom Congress intended statutory protection as actual or potential employees will receive it."

We first observe that notwithstanding Beacon's protestations to the contrary, this is essentially an argument that *Toering* must be applied retroactively. Until *Toering,* the Board did not require the General Counsel to establish an applicant's bona fide interest in the position applied for as part of the General Counsel's case. The argument that the NLRA requires what *Toering* requires without regard to when *Toering* was decided, and therefore a violation of the NLRA was not established, is basically an argument that because the issue in *Toering* was so essential to a proper construction of the Act, *Toering* must be applied retroactively. However, Beacon disavows any challenge to the Board's decision on retroactivity and, indeed, the Board's decision whether to apply a new rule retroactively is entitled to judicial deference absent manifest injustice. *N.L.R.B. v. Jackson Hosp. Corp.*, 557 F.3d 301, 310 (6th Cir. 2009) (noting that "appellate review is confined to determining whether, after the Board has decided to apply a new standard retroactively or not, that decision would work a manifest injustice on the parties"); *Adair Standish Corp. v. N.L.R.B.*, 912

15

F.2d 854, 866 (6th Cir. 1990) (noting that "[u]nless manifest injustice can be shown, the Board's judgments on retroactivity should be upheld").

Beacon also argues that the General Counsel did not carry his burden of proof on the threshold issue whether the alleged discriminatees had the subjective intent to seek employment by introducing evidence pertaining to some of the alleged discriminatees, and that Beacon should have been permitted to both cross-examine the General Counsel's witnesses and also introduce evidence of its own in rebuttal, by compelling the testimony of each alleged discriminatee. Beacon also asserts that there was insufficient evidence to support a finding that the alleged discriminatees had the subjective intent to seek employment.

**1. Beacon was permitted to litigate whether the discriminatees were bona fide applicants covered by the Act within the existing framework, which allowed Beacon adequate opportunity to litigate the issue.**

Despite Beacon's characterization of the record, this is not a case where the General Counsel failed to present any evidence that the applicants genuinely sought employment and were therefore covered under the Act, or where the employer was entirely foreclosed from exploring the issue. Notwithstanding the ALJ's discovery ruling, witnesses called by the General Counsel were examined and cross-examined regarding their availability for, and interest in, employment with Beacon. Matthew Kolbinsky, the Union organizer, was cross-examined regarding his intent to work for Beacon if hired, his employment history since becoming an organizer, including his being hired by another non-union employer and working only one day, his activities with respect to the salting campaign at Beacon, the Union's practice of paying subsidies to members working at non-union shops as part of organizing efforts, and his conduct at Beacon, including in recording the application attempts. Kenneth Mueller, another organizer, was similarly questioned and gave testimony

16

concerning his desire to work, his previous efforts to apply at Beacon, and his own and others' behavior during the application attempts.

The General Counsel called three other applicants who had held Union positions at some point, Steve Jaeger, Wayne Whalen, and Walter Zimmer. They were similarly examined and cross-examined. On cross-examination, Zimmer testified that when he first attempted to apply at Beacon on Februray 21, he had been unemployed since the preceding July. When Beacon's counsel asked what other types of things he had been doing to attempt to find a job, the General Counsel objected, and the following exchange ensued:

> [COUNSEL FOR BEACON]: Your Honor, I believe it goes to whether or not he's a bona fide applicant. Whether he was making efforts at other employers or simply Beacon Electric during the time frame.

> [THE GENERAL COUNSEL]: If I may speak to that, Your Honor. Whether – the question whether or not he's a bona fide applicant at Beacon Electric, has no bearing on whether he attempted to make application at other employers.

> [COUNSEL FOR BEACON]: Your Honor, if we might just limit it to the time frame between February and May. I mean, I don't think that's too far out of bounds.

> [ALJ]: I think it would apply only to the back pay portion of the proceeding and to whether he was trying to mitigate after he first applied by seeking other employment. So, I'll sustain the objection.

The ALJ allowed Beacon a continuing objection to not being able to ask the question of further witnesses.

The General Counsel called four other alleged discriminatees who did not hold Union positions. These rank-and-file witnesses were also examined and cross-examined regarding their employment status when attempting to apply at Beacon, their motivation, the circumstances of their going to Beacon and their activities there.

17

After the General Counsel rested, Beacon recalled two Beacon employees. At the end of the day, after Beacon's counsel suggested that the hearing be adjourned early that day, which was a Friday, and resume Tuesday morning, the ALJ inquired whether Beacon would complete its proofs on Tuesday. Beacon's counsel responded:

> Your Honor, at this point, we've discussed it and I guess we're really not in a position to give you an accurate figure of how many people we're going to call. I guess we really need to actually do a little more research and look into the issue.
>
> I think our position, as . . . General Counsel has alleged in the Complaint, that there were fifty people that we're [sic] discriminated against. We're concerned whether or not we will be waiving any of our client's rights or defenses if we don't attempt to question each and every Union applicant. We would like to avoid that and if it's not going to relinquish any rights of our client we would anticipate getting done in short order. If that 's not --
>
> [ALJ]: Well, I would be amenable to say letting you get into some detail if I considered it relevant with one witness so that I would take as a representative so that you could apply any argument to the others and would not be considered as having waived any argument by --
> . . . .
> [BEACON'S COUNSEL]: Would that be one from each group, Your Honor, or --
>
> [ALJ]: Well, it depends on the categories. There could be separate categories but again, I would be concerned that – about getting into matters that I consider more relevant to the compliance stage rather than this stage of the proceedings.
>
> [BEACON's COUNSEL]: Okay.
>
> [ALJ]: I would tend to limit any evidence that I thought should relate to the later stage.

When the hearing reconvened the following Tuesday, Beacon recalled a Beacon employee and then called three rank-and-file applicants as part of its case. Beacon first called Paul Elbisser, Sr., and was permitted to inquire into his employment status at the time he attempted to apply at Beacon in February 1997, and when and where he last worked before attempting to apply at Beacon. When the ALJ sustained the General Counsel's objection to the question why Elbisser left his last place of

employment, Archibold Electric, in November or December of 1996, Beacon's counsel stated for the record:

> I've got a series of questions that I have prepared, that I wanted to ask Mr. Elbisser. And I know there has been some question whether or not certain questions are more proper for the back-pay proceedings, as being evidence of mitigation as opposed to evidence that we believe would go to an applicant's bonified [*sic*] applicant status. And that's what we're trying to do with – with many of these questions.
>
> And I don't want to waste the Court's time. And I want to try to expedite matters here. So I am going to go ahead and ask these series of questions. And I assume General Counsel is going to object to a number of those questions.
>
> And I guess what I'm – I just wanted to let you know beforehand, that we're trying to get an idea of the parameter of questions that we're going to be allowed to ask each rank-in-file [*sic*] member, and then based on that I think we're going to make a decision as to the number of witnesses that . . . we want to call subsequent to questioning Mr. Elbisser.

Beacon's counsel resumed questioning and was permitted to inquire whether Elbisser was actively seeking a job in February 1997, and elicited testimony that Elbisser went to Las Vegas three times looking for work and was planning to leave for Las Vegas when Archibold Electric called him back to work in the beginning of March. Beacon's counsel was not permitted to inquire whether Elbisser attempted to apply at any other companies during February of 1997, the ALJ concluding that the question went to mitigation of damages rather than his status as a bona fide applicant. Nor were questions regarding unemployment compensation and workers compensation permitted. However, Beacon was permitted to ask whether Elbisser was on the hiring hall list during the relevant time period, whether he ever worked for a non-union contractor while he was a member of the Union, and whether there were any rules or regulations regarding working for a non-union contractor.

19

Beacon was also permitted to inquire how Elbisser came to apply to Beacon,[14] and to which other

_____

[14]Beacon cites as an example of the ALJ's limiting its ability to adduce evidence that applicants were not truly interested in employment with Beacon, the colloquy below, but Beacon's brief quotes only a portion of the colloquy – the italicized portion:

Q. Can you tell me, sir, what prompted you to seek employment at Beacon Electric?

A. I was at a union meeting and they stated that they were gonna go out and apply for work at Beacon Electric. And I don't know if I signed anything or what, but – uh, I took and – uh, I don't know how it is I got to the hall to go out.

Q. Were any other contractors mention or was it strictly Beeacon?

A. Uh - - we also went to Garfield Electric.
. . . .
Q. Do you remember who was – who in the Union then was advocating going out, running the meeting or saying that we're intending on getting some people and going out to Beacon Electric to apply?

A. Yes, Matt was.

Q. Matt Kolbinsky?

A. Yes.

Q. *Would you have gone out and applied at beacon Electric, had it not been for the meeting?*

[GENERAL COUNSEL]: *Objection, Your Honor, speculative.*

[BEACON'S COUNSEL]: *Your Honor, I think he's testifying as to his intention. And I –I think this witness is qualified to – to tell us whether or not he would have taken any given action.*

[ALJ]: *Would you have know about any prospect for employment at Beacon Electric, other than through the infirmation that you got during the meeting?*

*A. I guess really not.*

[BEACON'S COUNSEL]: *Okay. Now, I'm sorry, Your Honor, did you sustain the General Cousel's objection on the question of whether or not he would go – would have gone out to Beacon without that knowledge or without encouragement by the Union?*

20

non-union employers he applied.

Beacon asked similar questions of the other two rank-and-file witnesses, presenting testimony regarding whether they were truly seeking employment, whether they had worked at non-union shops and when, how they came to apply at Beacon, how they got there and who they went with, and the details of their experiences and behavior when attempting to apply at Beacon.

After hearing the testimony of the three applicant witnesses called by Beacon, and before adjourning the hearing for the day, the ALJ inquired of the attorneys regarding their remaining witnesses. Counsel for Beacon stated that he had five more rank-and-file witnesses to call. The following morning, however, counsel for Beacon recalled Mueller and a Beacon employee, and then stated that he had no more witnesses.

Thus, although the ALJ did not permit Beacon to explore the issue to the extent Beacon desired, Beacon was most certainly permitted to question both Union-organizers and rank-and-file members regarding the sincerity of their purported interests in securing employment with Beacon, whether they were actually unemployed at the time they applied, whether the Union representatives actually worked on jobs, as opposed to Union activities, whether the applicants had worked for non-union employers before, and to a limited extent, what else they did to obtain employment. We reject Beacon's implied argument that had it been permitted to further litigate the issue, it would have

---

[ALJ]: *Well I substituted my question.*

[BEACON'S COUNSEL]: *Okay. Well I'll go ahead and get mine ack on the record and --*

[ALJ]: *I'll sustain the objection.*

established that the alleged discriminatees were not bona fide applicants because they did not sincerely seek employment with Beacon.

Beacon was also permitted to present evidence regarding the applicants' motivations, behavior and tactics when seeking to apply, thus challenging whether they were bona fide applicants, and defending on the basis that it would not have hired the salts because of their behavior and insincerity. Further, the record does not support that Beacon was limited in the number of applicant witnesses it was allowed to call. Rather, it appears that Beacon made its own decision not to call additional applicants.

In addition, under the framework then in place, Beacon could have presented additional evidence that it would not have hired the salts in any event because of their behavior and their perceived lack of genuine interest in employment with Beacon. This was a permissible affirmative defense under the *FES* framework. We recognize that there is a distinction between the need to establish that the salts were genuinely interested in employment with Beacon on the one hand in order to prove a prima facie case, and the opportunity to present an affirmative defense once the salts have been shown to be genuinely seeking employment. However, in the instant case, the General Counsel established that the applicants were genuinely interested to the ALJ's satisfaction.

**2. The ALJ made findings regarding whether the discriminatees were bona fide applicants, and those finding are adequately supported by the record.**

The ALJ's first decision was issued before *FES,* but after *Flour Daniel II*. The ALJ found that the General Counsel had met his initial burden of proof, acknowledged both of Beacon's defenses – a non-discriminatory referral policy and no bona fide applicants – and found both

unsupported by the record. The ALJ addressed Beacon's challenge to the applicants' true motivations:

> Here, [Beacon] attempts to refute the Gerneral Counsel's showing by asserting the legitimacy of its hiring practices and by making a collateral attack on the Union's organizational practices. Applications by full time regular Union Business Agents or organizers (not primarily employed in the trade), even if currently qualified in the trade may be legally justified, but appears to be counter productive in a practical sense, where other bona fide applicants who are actually, usually, and regularly employed in the trade are shown to have experienced possible discrimination and the pursuit of charges on behalf of regular union staff personnel merely acts as a distraction from an evaluation of any direct and (more relevant) evidence of discrimination. Otherwise, however, the Board's decisions in *Sunland Construction Co*, 309 NLRB 545 (1992) and *Ultrasystems Western Constructors,* have found unequivocally that paid union organizers are statutory employees entitled to the protection of the Act, and the fact that their employment period might be of limited duration does not act to invalidate that status.

> The law also does not require that job applicants must be unobtrusive in respect to their union affiliation in order to be considered to be bona fide applicants and the possibility that more subtle tactics might be more effective with any particular company does not make discrimination in the application process any less unlawful or any less deserving of a remedy and it does not offer an employer an excuse for engaging in discriminatory practices.

> A job seeker's participation in group attempts to file applications and the fact that a union may have supplemental objectives in supporting its members in their attempts to obtain employment does not act to preclude their viability as legitimate job applicants. *Here, the majority of the alleged discriminatees were unemployed and were seriously interested in engaging in employment that might have the advantage of keeping them at a particular jobsite for a lengthy period and they were experienced electricians and presumptively qualified for positions that the Respondent would need to fill to meet its manpower requirements.*
> . . . .
> The fact that the tactics used by the Union may be unwise or unsuccessful does not make a Respondent's conduct any less discriminatory. The propriety of an employer's conduct in a failure to hire proceeding turns on the nature of the act, not on the motive or intent of the job applicant, unless special circumstances, not shown here, exist.
> . . . .
> Although [Beacon] objects on brief to the video taping and related union conduct, there is no showing that [Beacon's] supervisors or receptionists were

23

threatened or intimidated and there was no request made for the Union to stop and compare the extreme factual circumstances in *Heiliger Electric Corp.*, 325 NLRB 966 (1998). Under these circumstances, I find that consistent with the Supreme Court's decision in *NLRB v Town & Country Electric*, 516 U.S. 85 (1995), all the involved applicant discriminatees are bona fide applicants. [Emphasis added.]

Beacon argues that the record does not contain evidence sufficient to support the ALJ's finding that the alleged discriminatees had the subjective intent to seek employment. We disagree. The record supports that the witnesses were unemployed and actively seeking employment when they applied. That they would have been paid subsidies by the Union and would have sought to organize the workforce does not negate that they would have worked for Beacon if hired. In distinguishing the instant case from *Heilinger Electric*, the ALJ demonstrated his awareness that there can be situations where the applicants' actions and behavior during their attempts to apply "discredit[] the stated intentions by the applicants that they were there seeking work" or are "sufficiently intimidating and disrespectful to privilege a decision by Respondent to not hire" them. In short, the proceedings, record and decisions of the ALJ and Board are such that Beacon had an adequate opportunity to argue and prove that the salts were not bona fide applicants for employment, the ALJ actually considered the issue and found based on the evidence that the salts were unemployed and in fact sought employment with Beacon, the evidence was adequate to support this affirmative finding, and the Board's decision that the record supports a violation of the Act is legally and factually sound.

C

The Board's decision whether *Toering* should be applied retroactively is entitled to deference and is not challenged by Beacon. Even so, the Board's decision in this case is not undermined by

24

*Toering* because the ALJ actually found that the discriminatees were bona fide applicants and the record supported the finding.

This court reviews the Board's interpretation of the Act to determine whether it "is based on a permissible construction of the statute." *N.L.R.B. v. Webcor Packaging, Inc.*, 118 F.3d 1115, 1119 (6th Cir. 1997). However, no judicial deference is accorded to an agency's allocation of burdens of persuasion governed by the Administrative Procedure Act (APA). *Fluor Daniel II*, 161 F.3d at 967-68 n.16. Section 7(c) of the APA deals with allocating burdens of proof in an agency action, and states, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d). In *Fluor Daniel II*, this court noted that "[t]he Supreme Court has . . . held that no judicial deference is to be accorded to an agency's allocation of burdens of persuasion that are governed by the APA." 161 F.3d at 967 n.16.

At argument, we invited counsel to address the question whether the difference between the Board's decisions in *FES* and *Toering* concerns application of the NLRA, as to which we must accord *Chevron* deference, or allocation of burdens under the APA, as to which we do not. Beacon's brief in response to the panel's question argues that the difference concerns only the APA because *Toering* placed the burden of establishing the NLRA's applicability on the General Counsel.

Thus, Beacon seeks to avoid the deference we would ordinarily accord the decisions of the Board under *Chevron* by arguing that the issue is not one of substantive law, but rather of the proper allocation of the burden of persuasion under the APA. To be sure, this is a distinction recognized by the Supreme Court, see, *e.g.*, *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997), and by this court in *Fluor Daniel II*, 161 F.3d at 967 n.16, but we are not persuaded that the distinction is relevant here.

25

The Board's treatment of salting cases has evolved over time in response to changes in the methods and tactics employed in salting campaigns and the objectives of the unions. Although the General Counsel has always had the burden of proof on whether there has been an unlawful refusal to hire an "employee" covered by the Act, the elements of such a violation and the framework for establishing or refuting it are within the purview of the NLRB. The Board has expertise in determining, at any given point in the evolution of Labor-Management relations, based on experience in the field, which aspects or elements of an unfair labor practice can be assumed to be present without proof to the contrary, and which should be established as part of the General Counsel's case.

It was the Board that first decided that union-employed salts are employees covered by the Act. The Supreme Court deferred to that decision as a reasonable construction of the Act. *Town & Country*, 516 U.S. 85. At the time, experience with salting campaigns was such that salts generally sought to work at a non-union employer to organize the work force. The fact that the salts had dual objectives did not render them something other than bona fide applicants for employment. Salting campaigns have changed since *Town & Country* was decided. Where before the common objective was to infiltrate the labor force, many current salting campaigns are aimed at involving employers in costly litigation. The changing reality caused the Board to reconsider its approach in *Toering*. *Toering* addressed both the definition of an employee under the Act and the framework for establishing a violation of the Act, including the burden of proof regarding employee status:

> The Board's experience in deciding hiring discrimination cases confirms that the protections afforded statutory employees must be limited to job applicants who are genuinely interested in seeking to establish an employment relationship with the employer. . . the absence of any limitation on the scope of protection for job applicants creates the real and unacceptable possibility of abuse of the Board's processes in efforts to accomplish goals fundamentally inconsistent with the policies and purposes of the Act.

26

Under the current approach to hiring-discrimination allegations, the Board employs an implicit – and effectively conclusive – presumption that any individual who actually applies for a job is entitled to protection as a Section 2(3) employee. As a consequence, applicants have been accorded statutory employee status and have been alleged as 8(a)(3) discriminatees even when they have engaged in conduct clearly intended to provoke a decision *not* to hire them, or have engaged in antagonistic behavior toward the employer that is wholly at odds with an intent to be hired . . . .

[] In some cases, there is reason to doubt that the submission of batched applications by a third-party union representative was authorized by the putative individual applicants. Even if authorized, there is reason to doubt that the applicants had any real interest in going to work for a nonunion employer. On the contrary, consistent with the International Union's policy directive in this case, those applications may be submitted for the sole purpose of creating "a prima facie case of statistical discrimination" upon which to base unfair labor practice claims . . . .
. . . .
As mentioned, current Board law permits these cases to be litigated as potential unfair labor practices because statutory employee status is conclusively presumed from the mere submission of an application. In practice, this means that the issue of an applicant's genuine interest in employment can generally be raised only as an affirmative motivational defense by an employer claiming to have denied the applicant a job, or job consideration, because it knew or had a good-faith reason to believe that the applicant had no real interest in working for it. Consequently, the General Counsel generally will not present evidence at the hearing of the applicant's genuine job interest . . . .

We recognize that union salting campaigns may involve activity protected by Section 7 of the Act. Although some salts, paid or unpaid, may genuinely desire to work for a nonunion employer and to proselytize co-workers on behalf of a union, other salts clearly have no such interest . . . .
. . . .
[] Clearly, employers are not to be immunized from lawful economic pressure resulting from labor disputes. However, there is a meaningful distinction between direct economic warfare between parties to labor disputes and the subversion of the Board's processes by one party for the objective of inflicting economic injury on the other. The Board does not serve its intended statutory role as neutral arbiter of disputes if it must litigate hiring discrimination charges filed on behalf of disingenuous applicants who intend no service and loyalty to a common enterprise with a targeted employer.

We seek to discourage cases where unfair labor practice allegations of hiring discrimination are filed for this objective. We therefore believe that a change in law is warranted so as to better insure against it. We find that this result is better

achieved by shifting the focus with respect to an applicant's genuine job interest from the employer's proof of a motivational defense to the General Counsel's proof that an applicant is entitled to the protected status of a statutory employee. Thus, we will abandon the implicit presumption that anyone who applies for a job is protected as a Section 2(3) employee. As more fully discussed below, we will impose on the General Counsel the burden of proving the applicant's genuine job interest.

. . . .

[] We now hold, for all of the reasons stated above, that the General Counsel's burden of proof in all hiring discrimination cases includes the burden to prove that the alleged discriminatee was an applicant entitled to protection as a Section 2(3) employee, i.e., an applicant genuinely interested in seeking to establish an employment relationship with the employer.

This requirement embraces two components: (1) there was an application for employment, and (2) the application reflected a genuine interest in becoming employed by the employer . . . .

As to the second component (genuine interest in becoming employed), the employer must put at issue the genuineness of the applicant's interest through evidence that creates a reasonable question as to the applicant's actual interest in going to work for the employer. In other words, while we will no longer conclusively presume that an applicant is entitled to protection as a statutory employee, neither will we presume, in the absence of contrary evidence, that an application for employment is anything other than what it purports to be. Consequently, once the General Counsel has shown that the alleged discriminatee applied for employment, the employer may contest the genuineness of the application through evidence including, but not limited to the following: evidence that the individual refused similar employment with the respondent employer in the recent past; incorporated belligerent or offensive comments on his or her application; engaged in disruptive, insulting, or antagonistic behavior during the application process; or engaged in other conduct inconsistent with a genuine interest in employment . . . . Assuming the employer puts forward such evidence, the General Counsel, to satisfy the genuine applicant element of a prima facie case of hiring discrimination, must then rebut that evidence and prove by a preponderance of the evidence that the individual in question was genuinely interested in seeking to establish an employment relationship with the employer. Thus, the ultimate burden of proof as to the Section 2(3) status of the alleged discriminatee-applicant rests with the General Counsel.

[] Thus, if at a hearing on the merits, the employer puts forward evidence reasonably calling into question the applicant's genuine interest in employment, the General Counsel must prove the applicant's genuine interest by a preponderance of the evidence in order to prove that the applicant is an employee within the meaning of Section 2(3). An employer's motivation for making an alleged discriminatory hiring

decision does not become relevant until the General Counsel satisfies his burden of proof on the applicant's statutory employee status.

*Toering*, 351 N.L.R.B. at 229-234.

We quote *Toering* at such great length to make clear that it represents the Board's judgment, based on its experience, that "[t]he Congressional goal of industrial peace through the 'friendly adjustment of industrial disputes' is not furthered by extending the Act's protections against hiring discrimination to [disingenuous] applicants." *Toering*, 351 N.L.R.B. at 231. In furtherance of that judgment the Board "abandon[ed] the implicit presumption that anyone who applies for a job is protected as a Section 2(3) employee . . . [and] impose[d] on the General counsel the burden of proving the applicant's genuine job interest." *Id.*

In *Transportation Management*, the Supreme Court made clear that the deference due the Board in its interpretation of the Act extended to its decision to employ the burden-shifting framework set forth in *Wright Line*, notwithstanding that that framework treated the employer's dual motivation as an affirmative defense to be proven by the employer. 462 U.S. at 399-400. The Supreme Court reaffirmed that determination in *Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 278 (1994):

> And although we reject *Transportation Management's* reading of § 7(c),[15] the holding in that case remains intact. The NLRB's approach in *Transportation Management* is consistent with § 7(c) because the NLRB first required the employee to persuade it that antiunion sentiment contributed to the employer's decision. Only then did the NLRB place the burden of persuasion on the employer as to its affirmative defense.

---

[15]In *Transportation Management*, the Court held that the phrase "burden of proof" in § 7(c) of the APA refers to the burden of production, not persuasion. 462 U.S. at 402-03. The Court retreated from that position in *Greenwich Collieries* and held that the term refers to the burden of persuasion, not production. 512 U.S. at 277-78.

Thus, we reject the argument that this court is obliged to review this case under the *Toering* framework because the Board was without statutory authority to follow the *FES* framework under the APA. The *FES* framework was as much within the Board's authority as the *Wright Line* and *Toering* frameworks.

We further observe what should be evident from our perhaps over-inclusive account of the proceedings below. Notwithstanding that *Toering* had not yet been decided, the genuine interest of the applicants was not presumed, but was litigated, and was found as fact based on the record. The General Counsel was required to show a violation of the Act and did so.

We **GRANT** the General Counsel's petition for enforcement. We remand for further proceedings consistent with this opinion.